Filed 9/29/15  P. v. Williams CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C076196 |
| Plaintiff and Respondent, | (Super. Ct. No. 10F02827) |
| v. | |
| KEITH WILLIAMS, JR., | |
| Defendant and Appellant. | |

A jury convicted defendant Keith Williams, Jr., of first degree murder with lying in wait and active participation in a street gang special circumstances (Pen. Code, §§ 187, subd. (a), 190.2, subd. (a)(15) & (a)(22))[1] and attempted premeditated murder (§§ 187, subd. (a), 664).  The trial court sentenced defendant, who was a juvenile when the crimes were committed, to 32 years to life.

---

[1] Undesignated statutory references are to the Penal Code.

On appeal, defendant contends his first degree murder conviction and the special-circumstance findings must be reversed due to instructional error on aider and abettor liability. He also contends the case must be remanded for resentencing because the trial court did not understand its discretion to impose concurrent terms and trial counsel was ineffective for failing to point out the court's misunderstanding. We shall remand for resentencing and otherwise affirm.

FACTUAL BACKGROUND

Around 11:00 p.m. on May 19, 2009, Ja'Ron Franklin was sitting in his front yard with his friend and neighbor, Paul Cousins. Franklin saw two males he did not recognize walking on the other side of the street. The shorter[2] of the two men crossed the street and started firing a gun at them. The man stumbled and dropped the weapon, then picked it up, pointed it at Franklin and Cousins, and asked for their possessions. After Cousins and Franklin replied that he had the wrong people, the man fired into Cousins's chest. Franklin tried to take cover behind a green electrical box, but was shot six times. Franklin survived but Cousins died, also having sustained multiple gunshot wounds. According to Franklin, the taller male fled with the shorter man after the shooting.

David Rodriguez, who lived nearby, heard gunshots as he was about to go to bed that night. He looked out an upstairs window and heard a couple of men running to a car. He then saw a white Cadillac coupe drive off with its headlights off.

Marquice Corona shared siblings with Cousins and was very close to him. Cousins told him that he hung out with members of the Gunz street gang. These members were Cousins's friends. About a month before he was killed, Cousins told

---

[2] Franklin testified that the shorter man was about five feet five inches or five feet six inches tall and the taller one was between 5 feet 11 inches and six feet one inch tall. He admitted that he had told officers at the scene of the shooting that the shooter and the other man were both about 5 feet 10 inches tall. Defendant is 5 feet 10 inches tall.

Corona that he was getting into it with some guys from Starz. Cousins said some people "want problems with him." At that time, Gunz was "beefing" with the StarzUp gang. While he was never a member of the Gunz gang, when Cousins had problems with members of Starz, he would represent himself to be a Gunz guy.

Kevin Robinson, a member of the Starz gang, contacted law enforcement with information about the case, a conversation he had with Deandre Ellison concerning defendant's involvement in the shooting. Ellison agreed to give information about the shooting in exchange for assistance in a pending case.[3] He told officers that defendant "got into [it] with some GunzUp dude" and began shooting.[4]

After conversing with law enforcement, Ellison decided to write a letter to defendant in order to learn more about the shooting. Defendant replied by telling him that "two people got hit" and that he emptied a nine-millimeter handgun.

Law enforcement set up three pretext calls between Ellison and defendant, who was on juvenile probation at the Woodward Academy in Iowa. They also asked Ellison to duplicate from memory the letter he sent to defendant.

During the first pretext call, defendant told Ellison there were "two of them" and he "emptied the whole bag," a term for using all the bullets. Defendant also said he used a "nip," which meant a nine-millimeter handgun. In the second pretext call, defendant claimed responsibility for several other shootings. He also referred to details of the charged shooting, such as seeing two men sitting on the "little green thing," a reference to the green electrical box at Franklin's house. Defendant also mentioned a white Cadillac and claimed to have been the shooter. At one point during the second call, Ellison asked

---

[3] Ellison died before the trial and his preliminary hearing testimony was read to the jury.

[4] Ellison had told an officer that defendant said he had "got into it" with people from "Gunz down." Defendant is a member of the Starz street gang.

defendant, "And them, them was GDs[5] wasn't they?" Defendant replied: "Yeah. Cause, cause, cause, I, uh hit him up with it and they, they threw it back at me, so that's how I knew they was one." According to defendant, "they said what's up," and so he "melted them." Defendant also took credit for being the shooter in the third pretext call.

Defendant, testifying on his own behalf, said that in 2009 he was 17 years old and a member of the StickUp Starz gang. On the night of the shooting, defendant was at a friend's recording studio with Ellison and some others. Defendant left in a white Cadillac with two men, thinking they were going to a party; he sat in the back seat and was intoxicated. On the way, the men stopped the car and got out, one of them, "Bama," started to shoot. All three of them ran away after the shooting. A few days later, defendant called Ellison and told him about the shooting.

Defendant admitted to the shooting in his correspondence with Ellison because he did not want to appear to be weak within his gang.

DISCUSSION

I

Defendant contends the trial court erred in instructing the jury that he could be guilty of first degree murder and premeditated attempted murder as an aider and abettor under the natural and probable consequences doctrine, where assault was the targeted offense. We agree, but find the error harmless beyond a reasonable doubt.

The trial court instructed the jury that defendant could be guilty of the charged offenses as a direct perpetrator, as an aider and abettor, or as the natural and probable consequence of the crime of assault. As to first degree murder, the trial court provided the standard aiding and abetting instruction, CALCRIM No. 401, which stated in pertinent part that the People must prove that "defendant personally had an express intent

_____

5 According to Ellison, "GD" refers to the Gunz Down gang.

4

to kill." Regarding the natural and probable consequences theory, the trial court instructed the jury with CALCRIM No. 403, which stated in pertinent part that the People must prove that "1. The defendant is guilty of assault;  [¶]  2. During the commission of assault a co-participant in that assault committed the crime of first degree murder; and, [¶]  3. Under all of the circumstances, a reasonable person in defendant's position would have known that the commission of the first degree murder was a natural and probable consequence of the commission of the assault." The jury was told that "you could find the defendant guilty on more than one theory of liability" and that "[y]ou . . . don't have to agree on which theory of murder you come to your conclusion on." "Three of you could . . . think he knew that that was going to be a murder, he was trying to help out on that; and three of you can say . . . I think he knew there was going to be an assault, and he wanted to help with that, and the murder was probable."

Defendant contends and the Attorney General concedes that it was error to give CALCRIM No. 403 on liability for first degree murder because the natural and probable consequences theory of guilt cannot be used to support a conviction for first degree murder. We agree, as the California Supreme Court has held in a case decided after the trial, that a defendant cannot be convicted of first degree premeditated murder under the natural and probable consequences doctrine. In *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*), the Supreme Court said the public policy supporting the natural and probable consequences doctrine "loses its force in the context of a defendant's liability as an aider and abettor of a first degree premeditated murder." (*Id*. at p. 166.) The court explained that the mental state for first degree murder is uniquely subjective and personal, and the connection between the defendant's culpability and the perpetrator's premeditative state is too attenuated. (*Ibid.*)

Nonetheless, the Supreme Court in *Chiu* held that aiders and abettors "may still be convicted of first degree premeditated murder based on direct aiding and abetting principles. [Citation.]" (*Chiu, supra*, 59 Cal.4th at p. 166.) "[T]he prosecution must

5

show that the defendant aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission. [Citation.]" (*Id*. at p. 167.) "An aider and abettor who knowingly and intentionally assists a confederate to kill someone could be found to have acted willfully, deliberately, and with premeditation, having formed his own culpable intent. Such an aider and abettor, then, acts with the mens rea required for first degree murder." (*Ibid*.)

"When a trial court instructs a jury on two theories of guilt, one of which was legally correct and one legally incorrect, reversal is required unless there is a basis in the record to find that the verdict was based on a valid ground. [Citations.] Defendant's first degree murder conviction must be reversed unless we conclude beyond a reasonable doubt that the jury based its verdict on the legally valid theory that defendant directly aided and abetted the premeditated murder. [Citation.]" (*Chiu, supra*, 59 Cal.4th at p. 167.) Instructional error is harmless if other aspects of the verdict or the evidence leave no reasonable doubt the jury made the findings necessary for the legally correct theory. (*People v. Chun* (2009) 45 Cal.4th 1172, 1205; *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1165-1166 [error here is harmless beyond a reasonable doubt if the jury necessarily resolved the issues against the defendant under the other instructions given].)

Regarding the lying-in-wait special circumstance, the jury was instructed with CALCRIM No. 728, which in pertinent part stated that: "To prove this . . . special circumstance is true, the People must prove that: [¶] 1. The defendant intentionally killed Paul Cousins, and; [¶] 2. The defendant committed the murder by means of lying in wait. [¶] A person commits murder by means of lying in wait if: [¶] 1. He concealed his purpose from the person killed; [¶] 2. He waited and watched for an opportunity to act; [¶] 3. Then he made a surprise attack on the person killed from a position of advantage; and, [¶] 4. He intended to kill the person by taking the person by surprise."

6

The jury was also instructed that in order to convict defendant they all had to agree that defendant was guilty under one of the three theories of liability but they did not all have to agree on any particular theory of liability. The jury was not instructed with any theory of aider and abettor liability as to the lying-in-wait or gang special circumstances.

The two theories of accomplice liability are not tied to the evidence submitted by the prosecution. The prosecution's case overwhelmingly points to defendant as the shooter. The primary evidence submitted by the prosecution is defendant's statements that he was the shooter, as related in the pretext phone calls and in Ellison's testimony. That evidence also supplies the only proof for the lying-in-wait special circumstance, defendant's statement that he flashed a Gunz Down sign to the victims, and fired on them after they replied with Gunz Down signs. The only prosecution evidence showing defendant as an accomplice rather than a shooter was Franklin's statement that the shooter was the shorter of the two people and was five feet five inches or five feet six inches tall, supporting an inference that defendant, who was five feet ten inches tall, was not the shooter. However, Franklin's testimony is undercut by his statement to the police at the scene of the crime that the shooter and other person were both about five feet ten inches tall, and therefore consistent with defendant as the shooter. While a jury could rely on an aiding and abetting theory if they believed at least some of defendant's testimony that the man named Bama was the shooter, the prosecution's case supports defendant's liability only as the perpetrator.

" '[P]roof of lying-in-wait . . . acts as the functional equivalent of proof of premeditation, deliberation and intent to kill.' [Citation.]" (*People v. Boyette* (2002) 29 Cal.4th 381, 435.) Therefore, a jury that finds the defendant was lying in wait "necessarily" finds that the defendant also "premeditated and intended the killings." (*Id.* at p. 436.) As already noted, the prosecution's evidence shows defendant was lying in wait by flashing a Gunz Down sign to Cousins, a Gunz Down supporter. As a matter of law, the jury's true finding on the lying-in-wait special circumstance necessarily included

7

the finding that defendant acted with the requisite mens rea for first degree murder. (*Chiu, supra*, 59 Cal.4th at p. 166 [first degree murder requires a showing that the defendant acted willfully, deliberately, and with premeditation].) Since it is clear beyond a reasonable doubt that the jury found that defendant both intended and premeditated the killing, the error in instructing with CALCRIM No. 403 on the first degree murder charge was harmless.

II

Defendant additionally claims the special-circumstance findings must be vacated because it cannot be ascertained what theory of liability the jury used to convict him of first degree murder. Defendant correctly notes that a person can be convicted of first degree murder as an aider and abettor and be liable for a special-circumstance finding so long as that person has an intent to kill. (§ 190.2, subd. (c).) Defendant also points out that the trial court did not give the standard jury instruction on accomplice liability as to special-circumstance allegations, CALCRIM No. 702, which requires the jury to find that defendant had an intent to kill before sustaining a special-circumstance finding when the defendant was not the actual killer. According to defendant, since it cannot be determined whether the jury did find defendant guilty of first degree murder based on the natural and probable consequences theory, the true finding on both special circumstances must be reversed.

As previously discussed, the jury instruction for the lying-in-wait special circumstance required the jury to find that defendant intentionally killed his victim. The instruction on the gang special circumstance, CALCRIM No. 736, likewise required the jury to find that "[t]he defendant intentionally killed Paul Cousins." Since the jury necessarily found that defendant intended to kill Cousins, there was no error regarding the special circumstances and defendant's contention is therefore without merit.

## III

Defendant contends and the Attorney General concedes that the case must be remanded for resentencing because the trial court did not understand that it had discretion to impose concurrent terms for first degree murder and attempted premeditated murder.

At sentencing, the trial court stated, "[t]he indeterminate terms are mandatory consecutive pursuant to Section 667 . . . [subdivision] (c) . . . (7) and 1170.12 . . . [subdivision] (a) . . . (7) of the Penal Code." The court then imposed consecutive terms for the first degree murder and attempted premeditated murder counts.

The trial court was referring to part of the Three Strikes law requiring mandatory consecutive terms for every serious or violent felony conviction not arising from the same occasion or set of facts, when a prior serious or violent felony conviction has been pled or proven. (§§ 667, subd. (c)(7), 1170.12, subd. (a)(7).) Defendant was not subject to this provision because a prior strike was neither pled nor proven.

Absent statutory provision to the contrary, a trial court ordinarily has discretion to choose between imposing consecutive or concurrent terms in sentencing. (*People v. Rodriguez* (2005) 130 Cal.App.4th 1257, 1262.) However, a trial court's misunderstanding of the scope of its discretionary power is not an informed exercise of its discretion. (*People v. Marquez* (1983) 143 Cal.App.3d 797, 803.) If the record affirmatively reflects such a misunderstanding, we must remand for a properly informed exercise of discretion (*People v. Brown* (2007) 147 Cal.App.4th 1213, 1228) unless it is not reasonably probable that a more favorable sentencing decision would result. (*People v. Sanders* (1997) 52 Cal.App.4th 175, 178, disapproved on other grounds in *People v. Fuhrman* (1997) 16 Cal.4th 930, 947, fn. 11.)

Since the trial court was not required to impose consecutive sentences and nothing in the record indicates that it would have done so had it understood its discretion, we shall remand the case for resentencing. In light of this decision, we decline to address

defendant's contention that trial counsel's failure to point out the trial court's error constituted constitutionally ineffective assistance.

## DISPOSITION

The case is remanded for resentencing so that the trial court can exercise its discretion to impose consecutive or concurrent terms.  In all other respects, the judgment is affirmed.


<u>    /s/                      </u>
Blease, Acting P. J.


We concur:


<u>    /s/                 </u>
Hoch, J.


<u>    /s/                 </u>
Renner, J.